UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH BUCKLEY,<br><br>                  Petitioner,<br><br>           v.<br><br>JEFF MACOMBER,<br><br>                  Respondent. | Case No. 1:23-cv-00630-CDB (HC)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY**[1]<br><br>(Doc. 1) |

On April 24, 2023, Petitioner Kenneth Buckley ("Petitioner"), a state prisoner, filed a pro se petition for writ of habeas corpus alleging a single ground for relief ("Petition"). (Doc. 1). On May 23, 2023, Respondent filed an answer (Doc. 12), arguing Petitioner was not entitled to habeas relief, and lodged the state court record in support (Docs. 11, 11-1 through 11-10). Petitioner, through counsel, filed a traverse on June 26, 2023. (Doc. 16). For the reasons set forth below, habeas relief is not warranted and a certificate of appealability will not issue.

**I.     PROCEDURAL AND FACTUAL BACKGROUND**

A jury in the Kern County Superior Court convicted Petitioner of assault with a deadly weapon, child abuse, and several other crimes. (Doc. 11-8 at 1; *see* Doc. 11-2 at 53-62).[2] The court sentenced Petitioner to 14 years in prison. (Doc. 11-8 at 3; *see* Doc. 11-2 at 106).

---

[1] Based on the parties' expression of consent, on June 1, 2023, this action was assigned to a U.S. magistrate judge for all purposes, pursuant to 28 U.S.C. § 636(c)(1). (Doc. 14).

[2] Record citations herein are to the CM/ECF-assigned pages.

On appeal, the Fifth Appellate District Court of Appeal summarized the pertinent facts of the underlying offenses:[3]

> In 2016, a restraining order was issued against defendant, protecting his ex-wife, M.B. M.B. has three children: T.B., K.B. and Kh.B. According to M.B., defendant is possibly the biological father of K.B. and Kh.B., but not T.B.
>
> In April 2018, M.B. was in the backyard of her home in Bakersfield, hanging laundry outside to dry. Defendant, her ex-husband, approached and asked for food and water. He also asked, " 'Can I stay here in the shed?' " M.B. said, " 'No, you have to leave.' " Defendant left but returned sometime later. Again, defendant approached her in the backyard, wanting to talk. M.B. said, " 'No,' " and turned her back to defendant. Defendant grabbed her hair and punched her in the head and back with his fist. Defendant slammed M.B. into a wooden fence. Defendant dragged her by the hair back to the house. Defendant told M.B. to get in the house. M.B. went inside and collapsed in the living room due to the blows to her head. During the assault, M.B.'s earrings were ripped out, and her glasses were knocked off her head.
>
> M.B.'s son, K.B., was in the kitchen washing dishes. M.B. told defendant to, " 'Get out of here.' " Defendant, who now had M.B.'s kitchen knife, said, " 'I'm not playing with you, I will kill you right now.' " Defendant pointed the knife at her and touched it to her chest. Defendant said, " 'I will kill you.' " Defendant then called for M.B.'s children.
>
> Eventually, M.B. went to lie down, turned on the TV, and took care of her children while defendant remained in the home. That night, defendant called the children into the living room. The children complied and defendant told them, " 'Nobody is going to school tomorrow. Give me all the electronics.' " Defendant also told them: " 'You don't say nothing. You better not tell nothing. Nobody better not come knocking on the door. If I see any officers or anything, I'm just going to automatically stab your mom and your brother, and your baby brother.' "
>
> The children missed more than three days of school. According to M.B., defendant was now making the decisions as to whether and when the children or M.B. could leave the house. At one point, M.B. was able to leave and get groceries. However, she did not call for help because her children were at home with defendant.
>
> *Testimony of T.B.*
>
> T.B. was in ninth grade when he testified at trial. T.B. testified that defendant walked into the house, holding M.B. and a knife. Defendant pointed the knife at M.B. As he held the knife at M.B., defendant said, " 'I'll kill you.' " Defendant also told M.B., " 'I'll

---

[3] These facts are entitled to a rebuttable presumption of correctness. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

2

cut you.' " The next thing T.B. saw was M.B. lying on the floor, crying. T.B. went into a room and watched television.

At one point, T.B. went back into the living room to grab his brother, Kh.B. T.B.'s other brother, K.B., was washing dishes. Defendant pointed the knife at T.B., causing him to become afraid. Defendant told T.B., " 'I will cut you.' " K.B. did not hear any statements defendant made to T.B.

T.B. missed the three days of school immediately following the assault.

*Testimony of K.B.*

K.B. was 12 years old when he testified at trial. K.B. testified that he was washing dishes when he saw that defendant had become "mad" at M.B. in the living room. Defendant retrieved a knife and pointed it at M.B. from about two and a half to three feet away. Defendant said, " 'If you snitch or tell the police, I'm going to cut you or stab you.' " Defendant also said, " 'I will kill you.' "

Eventually, defendant and M.B. left the house for several minutes. At one point, defendant told K.B. and T.B., " '[I]f you tell anybody at the schools or somebody, I am going to – I'm going to kill your baby brother.' " Defendant was not holding anything at the time. Defendant's threat made K.B. sad and afraid because he did not want his baby brother to die. Initially, K.B. testified that defendant made this statement before defendant and M.B. left the house for several minutes. Later, he testified that defendant made the statement in question on an entirely different day.

K.B. missed the next three days of school because defendant said, " '[N]o one is going to school, no one's going nowhere.' "

*Defendant's Statement*

Officer Mariya Corral interrogated defendant on June 26, 2018. Defendant claimed he had been staying at M.B.'s house "on and off" and had been "using it for showering, toothbrush." Defendant claimed M.B. had invited him over on the day in question. Defendant denied hurting M.B. Defendant also claimed that he told M.B., " 'If anything happen [*sic*] put the blame on me.… [M]ake up I shot you or whatever so you won't get in trouble.' " M.B. allegedly responded, " 'Okay. Cool.' " Defendant claimed he was suggesting lying in order to protect his children.

Officers told defendant that his children "both had the exact same story." Defendant responded, "I trained 'em. I trained 'em well." Defendant claimed he told them, " '[If w]e ever get caught – my exact words – say that Daddy forced – I don't care because we not about to lose – you know what I'm saying?' "

*Prior Events*

M.B. also testified about prior incidents. On September 30, 2017,

3

> M.B. saw defendant at the side door of her house and panicked. She grabbed her children, put them in the car and drove away.
>
> On June 25, 2016, M.B. had a knock at her door. She opened the door and saw defendant. Defendant asked for her phone and yelled at her. M.B. went "back and forth with him" and told him to "leave or get out or he can't be here." Defendant was angry and began hitting her on her head, side, and back. M.B. was trying to block defendant's blows. Defendant told her to go into the backyard to turn on the grill. M.B. was crying and saying, " 'I can't do it.' " Every time she said she could not do it, defendant would "just throw blows inside my head." Defendant retrieved a fork and said, " 'You better do it.' " Defendant continued to hit her as they went into the living room. M.B. was on the floor telling him to stop. Eventually, defendant stopped and told her to go to the restroom. M.B. went to the restroom and stayed there for "a long time."
>
> Afterwards, defendant told her to get in the car and to take him somewhere. M.B. was driving and her baby was in the back seat. Defendant hit M.B. as she drove. M.B. tried to get out of the car, but defendant was able to grab her and throw her back in the car. Defendant administered more "blows." After reaching their destination, M.B. grabbed her baby, went into a fast food restaurant and exited a different door than she had entered. She began running away with her baby. She was able to make contact with a police officer, who took pictures of her injuries.

(Doc. 11-8 at 3-7 (footnotes omitted)). The appellate court struck two prior prison term enhancements and remanded the matter for resentencing and to correct two minute orders, but otherwise affirmed Petitioner's conviction. (*Id.* at 14). On February 23, 2022, the California Supreme Court summarily denied review. (Doc. 11-10).

Petitioner now presents a single ground for relief, arguing that there was insufficient evidence to support every element of the child abuse count. (Doc. 1 at 5).

## II.     STANDARD FOR FEDERAL HABEAS RELIEF

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA requires a state prisoner seeking federal habeas relief to first "exhaust[t] the remedies available in the courts of the State."[4]  28 U.S.C. § 2254(b)(1)(A). Where the state court adjudicates the claim on the merits, a petitioner is not entitled to habeas relief unless the adjudication (1) "resulted in a decision that was contrary to, or involved an

---

[4] The statute allows for limited exceptions inapplicable here. *See* 28 U.S.C. § 2254(b)(1)(B).

1   unreasonable application of, clearly established Federal law, as determined by the Supreme Court
2   of the United States," or (2) "resulted in a decision that was based on an unreasonable
3   determination of the facts in light of the evidence presented in the State court proceeding." 28
4   U.S.C. § 2254(d).

5         "Deciding whether a state court's decision 'involved' an unreasonable application of
6   federal law or was 'based on' an unreasonable determination of the facts requires the federal
7   habeas court to 'train its attention on the particular reasons—both legal and factual—why state
8   courts rejected a state prisoner's federal claims." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).
9   When the state court's decision "does not come accompanied with [its] reasons" for the decision,
10  a federal court "should 'look through' the unexplained decision to the last related state-court
11  decision that does provide a relevant rationale." *Id.* However, when there is no reasoned decision
12  to "look through," it may be presumed—in "the absence of any indication or state-law procedural
13  principles to the contrary"—that the state court adjudicated the claim on the merits and the
14  petitioner must show "there was no reasonable basis for the state court to deny relief."
15  *Harrington v. Richter*, 562 U.S. 86, 98-99 (2011).

16        Under 2254(d)(1), a decision is "contrary to" clearly established federal law if the state
17  court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case
18  law; or (2) reached a different result from the Supreme Court when faced with materially
19  indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). A state court decision
20  involves an "unreasonable application" of the Supreme Court's precedents if the state court
21  correctly identifies the governing legal principle but applies the facts of the petitioner's case in an
22  objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state
23  court either unreasonably extends a legal principle from [Supreme Court] precedent to a new
24  context where it should not apply or unreasonably refuses to extend that principle to a new
25  context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "A state court's
26  determination that a claim lacks merit precludes federal habeas relief so long as fair-minded
27  jurists could disagree on the correctness of the state court's decision." *Harrington*, 62 U.S. at
28  101. The petitioner must show that the state court decision "was so lacking in justification that

there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "State courts are accorded substantial deference. If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Marks v. Davis*, 106 F.4th 941, 949 (9th Cir. 2024) (citations and quotation marks omitted) (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)).

### III. ANALYSIS

Petitioner exhausted his sufficiency of the evidence claim by presenting it to the state courts on direct review and Respondent does not dispute that Petitioner's claim is exhausted. Accordingly, the claim must be evaluated under the deferential AEDPA standard. Because the California Supreme Court summarily denied Petitioner's request for review, this Court looks to the opinion of the Fifth Appellate District as the last reasoned decision. *See Wilson*, 584 U.S. at 125.

**A. Background**

On direct appeal, Petitioner challenged the sufficiency of the evidence to support his conviction for felony child abuse. (*See* Doc. 11-5 at 13-15). The appellate court rejected Petitioner's arguments, explaining:

> Defendant was convicted of violating section 273a, subdivision(a), which applies to "[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered …." (§ 273a, subd. (a).)
>
> As its text makes clear, this is an "omnibus" provision that proscribes four "branches" of conduct. (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215.) Regardless of which of the four "branches" of conduct is at issue, the defendant must have acted " 'under circumstances or conditions likely to produce great bodily harm or

6

death,' " otherwise there has been no violation of subdivision (a). (*People v. Smith* (1984) 35 Cal.3d 798, 806.)

Here, the prosecutor argued defendant willfully inflicted mental suffering on his children by saying threatening things to them and attacking their mother. It seems readily apparent that this conduct falls under the branch of conduct described in section 273, subdivision (a) as the willful infliction of unjustifiable "mental suffering." (§ 273a, subd. (a).) The question presented here is whether this wrongful conduct was committed "under circumstances or conditions likely to produce great bodily harm or death." (§ 273a, subd. (a).) "If so, the crime is punishable as a felony; if not, solely as a misdemeanor. [Citation.]" (*People v. Sargent*, *supra*, 19 Cal.4th at p. 1223.)

" 'Great bodily harm refers to significant or substantial injury and does not refer to trivial or insignificant injury.' [Citation.]" (*People v. Cortes* (1999) 71 Cal.App.4th 62, 80.) "However, there is no requirement that the victim suffer great bodily harm. [Citation.]" (*Ibid*.) "It is the likelihood of foreseeable injury, rather than whether such injury in fact occurs, that is relevant. [Citation.]" (*People v. Lee* (1991) 234 Cal.App.3d 1214, 1220.)

Courts have held that "circumstances or conditions likely to produce great bodily harm or death" under section 273a, subdivision (a) means: "a serious and well-founded risk, of great bodily harm or death." (*People v. Wilson* (2006) 138 Cal.App.4th 1197, 1204.) Thus, in this context, " 'likely' " is *not* synonymous with "probable" or "more likely than not." (*Ibid*.)

Here, there was substantial evidence that defendant's conduct occurred under circumstances that presented a serious and well-founded risk of great bodily harm. Defendant attacked T.B. and K.B.'s mother and was holding a knife to her. He also pointed the knife at T.B. and threatened to "cut" him. Defendant also threatened T.B. and K.B.'s infant brother. This volatile and chaotic situation posed a very real threat that the children could rush to defend their mother or brother or even attack defendant. Defendant's threats and his act of pointing the knife at T.B. indicated that he would have responded to such efforts by the children in a manner that would have led to great bodily injury or death. While no bodily harm to the children ultimately occurred, the jury could have reasonably concluded the circumstances were such that great bodily harm was *likely*.

Defendant argues there was no evidence in the record that the children got closer than eight feet from the knife. First, we observe that eight feet is not a great distance when it is all that separates a violent adult man threatening a child with a knife. Second, while the Attorney General's argument would be even stronger if the children were mere inches away from the knife, the distances involved here do not negate the "serious and well-founded risk" of great bodily harm or death present here.

Defendant also contends that "[d]eath threats alone" do not suffice to show sufficient likelihood of producing great bodily injury or death. However, there were more than death threats here. Defendant

7

> held a knife to the children's mother and pointed the knife at one of the children, while threatening them verbally.
>
> These circumstances are sufficiently dangerous for a jury to conclude they posed a serious and well-founded risk of great bodily injury.

(Doc. 11-8 at 7-9 (footnote omitted)).

### B. Law and Analysis

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Under *Jackson v. Virginia*, 443 U.S. 307 (1979), which sets forth the federal standard for determining a sufficiency of the evidence claim, such a claim "can only succeed when, viewing all the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018). Federal courts look to state law for the elements of the specific offense at issue. *Maquiz v. Hedgpeth*, 907 F.3d 1212, 1218 (9th Cir. 2018). When a federal habeas court reviews an insufficiency claim previously rejected on the merits by the state court, "a second level of deference applies under AEDPA" such that, to prevail, a petitioner must show that the "state court's determination that a rational jury could have found each required element proven beyond a reasonable doubt was not just wrong but was objectively unreasonable." *Johnson*, 899 F.3d at 1056-57.

California Penal Code § 273a(a) provides:

> Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years.

Petitioner argues there was no evidence that he "used force of any kind on any of the children" because "[n]othing in the record shows that the children got any closer to the knife than eight feet" and the state appellate court relied on speculation when it concluded there was "a very

8

1    real threat the children could rush to defend their mother or brother or even attack defendant" and
2    Petitioner would respond "in a manner that would have led to great bodily injury or death." (Doc.
3    1 at 5). Respondent argues the state court's rejection of Petitioner's claim was reasonable
4    because "Petitioner threatened his children with a knife[,] Petitioner's threats occurred directly
5    after he had violently beaten the children's mother, and while he held the family captive in the
6    mother's house." (Doc. 12 at 9). In reply, Petitioner argues the state court's reliance on "mere
7    speculation" to support his conviction was contrary to federal law. (Doc. 16 at 5).

8          The Court finds Petitioner's arguments unavailing. As the Ninth Circuit has explained,
9    California Penal Code § 273a is "'intended to protect a child from an abusive situation in which
10   the probability of serious injury is great,' but there is no requirement that great bodily injury
11   actually result." *Creech v. Frauenheim*, 800 F.3d 1005, 1014 (9th Cir. 2015) (quoting *People v.*
12   *Valdez*, 27 Cal.4th 778, 784 (2002)). A review of the record shows that M.B. testified at length
13   regarding Petitioner attacking her, causing her injuries, forcing her into her home where the three
14   children were present, and threatening her with a knife. (*See* Doc. 11-4 at 191-221). M.B. also
15   testified regarding a past violent interaction with Petitioner. (*Id.* at 223-34). T.B. testified that
16   Petitioner held a knife towards M.B. and threatened to kill her before also pointing the knife at
17   T.B. from approximately eight feet away and threatening to cut him. (Doc. 11-4 at 376, 380, 414,
18   434-37). K.B. also saw Petitioner pointing the knife at M.B. and heard him threaten to cut or stab
19   her. (Doc. 11-4 at 458-59). K.B. further testified that Petitioner told him that if he said anything,
20   Petitioner would kill his younger brother. (*Id.* at 464). Based on this evidence, the state appellate
21   court appropriately concluded that Petitioner willfully inflicted unjustifiable mental suffering on
22   the children by threatening them and attacking their mother, and "[w]hile no bodily harm to the
23   children ultimately occurred, the jury could have reasonably concluded the circumstances were
24   such that great bodily harm was *likely*." (Doc. 11-8 at 7-8).

25         While Petitioner views the state appellate court's decision as relying on "mere
26   speculation," the Court sees it as a reasonable inference the jury could make from the evidence
27   discussed above. Specifically, when faced with evidence that Petitioner committed multiple
28   violent acts against M.B., made threatening statements toward T.B. and K.B. while holding a

9

knife, and threatened to kill Kh.B., it was reasonable for the jury to conclude that it was likely under the circumstances that Petitioner's conduct would result in serious injury to the children. *See Creech*, 800 F.3d at 1014-15 (affirming denial of habeas relief because there was sufficient evidence to support a "likelihood of great bodily harm" when defendant shot birdshot into the home where children were located based on reasonable inference that children could have been seriously injured).

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found each of the required elements to support Petitioner's child abuse conviction beyond a reasonable doubt. As such, the state court's rejection of Petitioner's sufficiency of the evidence claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts and Petitioner is not entitled to federal habeas relief.

## IV.   CERTIFICATE OF APPEALABILITY

"[A] state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his application." *Miller-El v. Cockell*, 537 U.S. 322, 335-36 (2003). Rule 11 of the Rules Governing § 2254 Cases requires a court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this showing for claims rejected on procedural grounds, a movant must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of denial of a constitutional right and that jurists of reason would find it debatable whether the district was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a claim is rejected on the merits, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" to warrant a certificate of appealability.

Because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability.

**V.  CONCLUSIN AND ORDER**

For the reasons set forth above, it is **ORDERED**:

1. The Petition for Writ of Habeas Corpus (Doc. 1) is **DENIED**.

2. Petitioner is denied a certificate of appealability.

3. The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

Dated: **July 3, 2025**

UNITED STATES MAGISTRATE JUDGE